CHARLES HALL ADAMS.

v.

JOHN GEORGE SCHMITT et al.

[Decided February 2d, 1905.]

1. A contract to establish the title of a married woman to real estate for a reasonable compensation, to secure which an assignment of an interest in the recovery is provided, though not executed by her husband, and not executed by her separate and apart from him, has the effect, in connection with the establishment of the title, to invest the beneficiary with an equity, by reason of which equity will create a lien in his favor.

2. The rule applying to dealings between principal and agent, attorney and client and trustee and *cestui que trust,* does not apply in the making of a contract to recover an estate by one whose business it is to find

estates having no notorious claimant, to hunt up the heirs and recover the estates for them.

3. Complainant, having put defendants in possession of property as heirs under a power of attorney to recover an estate for them as heirs, is entitled to a lien thereon for his compensation, though strict proof of their heirship may not have been made, and the strength of their title rests on the fact that no one else can find a better one.

4. Defendants are estopped to assert that when they contracted with complainant to recover an estate for them he made no disclosure as to its extent and nature, where, after they are fully informed, they acquiesce in his further work and expenditure for them in the matter.

5. A power of attorney to complainant to collect all moneys, legacies, bequests, inheritance and distributive share of defendants in a certain estate, and for his taking possession of and attending to all landed property which they may be entitled to as heirs of deceased, and assigning to complainant such an interest in the property, estate or inheritance to which they are entitled as heirs or next of kin as will secure to complainant his fees for services, not to exceed fifty per cent. of "our distributive share of said decedent's estate as such heirs or next of kin," does not, by the words "distributive share," in view of the word "heirs," limit the assignment to personal property.

On final hearing on bill, answer and proofs.

*Mr. Charles L. Carrick,* for the complainant.

*Mr. Henry V. Condit* and *Mr. Richard Boardman,* for the defendants.

PITNEY, V. C.

The complainant, Charles H. Adams, filed his bill against (John) George Schmitt and wife, John Schmitt and wife, Henry Schmitt and wife, Rosa Helfrich and her husband, William Drennan and Eugene D. Knox, to establish and enforce an equitable lien upon a house and lot situate in Hudson county, and in aid thereof to set aside a conveyance made by the defendants the three Schmitts and Rosa Helfrich to Drennan, dated February 27th, 1903. The defendant Knox is made a party because he has been in the possession of the rents and profits.

The basis of the lien is a power of attorney—or, rather, two powers of attorney—substantially the same in verbiage, one

executed by Henry and John Schmitt and Rosa Helfrich, on July 9th, 1902, and one by (John) George Schmitt, on July 11th, 1902, both to the complainant, and both coupled with an interest in land. I shall give the contents more particularly hereafter.

. All the defendants, except Knox, have answered.

The allegations of the bill as to the lack of consideration of the deed from the parties named to Drennan are admitted, and a substantial defence to complainant's case thereon is attempted to be set up and proven by the four grantors of that deed, the three Schmitts—(John) George, John and Henry—and Mrs. Helfrich.

The execution of the powers of attorney are not seriously disputed, but it is alleged (1) that certain additions have been made thereto since their execution, and (2) that they were procured by what amounts to fraud, in that certain facts which were material for the parties executing them to know before executing them, and which were within the knowledge of the complainant, were concealed from them until after the execution.

At the close of the evidence on the part of the defence, and before the complainant had commenced his rebuttal, if any he had, the case on the part of the complainant seemed to me to be so clear that I suggested a settlement between the parties based on a right of recovery. That suggestion seemed to be cheerfully acquiesced in, and a stipulation, as afterwards stated by counsel, was entered into, which, however, seems to have broken down in the attempt to carry it out, and a motion was made by the complainant for a receiver. This was vigorously opposed and I suggested an argument on the merits. This has been had in writing, and I have now to state the result of my more elaborate examination of the case.

Mr. Adams is a lawyer, residing in Massachusetts, whose business is the acting as commissioner for all the states of the United States, and, also, he devotes his attention to the hunting up of the heirs and next of kin of vacant estates—that is, of estates for which there is no immediate and notorious claimant. For this purpose he has maintained a fully equipped office.

At the time covered by the matters involved herein he had a

friend and correspondent, a Mr. George A. Smythe, a Massachusetts lawyer, who was living in New York City and who was engaged in the same business, but had no office equipped for that purpose, and had an arrangement with Mr. Adams, the complainant, to do business for and with him in his name.

In November, 1901, there were living in New York City two unmarried brothers, named Gotlieb and Adolph Buchinger, but who assumed and went by the names of William and Adolph Burnett. William (or Gotlieb) was economical and thrifty, and acquired a small fortune; his brother, Adolph, had none of those qualities and little mental capacity. On the 18th of November, 1901, Gotlieb (or William) was instantly killed by an accident as he was passing an opening in the subway excavation in New York City. He died intestate, seized of the house and lot here in question and of upwards of $2,000 in money, deposited in a savings bank or banks in New York City. Letters of administration were granted by the surrogate of New York county on his estate to his brother, Adolph, and one William Dawson. The latter, who clearly appears to have been a designing and dishonest man, took possession of the personal estate and induced the several tenants of the house and lot here in question to attorn to him.

Adolph, the surviving brother, died April 14th, 1902, without any known heirs or next of kin. The proceedings had all been in the name of Burnett.

Dawson, the surviving administrator, failed to pay some small debt of either William or Adolph (some of the evidence says that it was for the funeral expenses of Adolph), and this creditor made inquiry at the surrogate's office, which appears to have excited the attention of someone there and to have come to the knowledge of Mr. Smythe.

That gentleman immediately took up the matter, called at the late residence, on Ninth avenue, of Gotlieb (or William) and made inquiries, and finally encountered an old German, who informed him that the real name of the two brothers was Buchinger and that they had had a sister, who had married a German named Frankenhauser, who lived in Guttenberg, in Hudson county. Mr. Smythe found this gentleman, who informed him

that the only relatives which he knew of the deceased was a family of Schmitts, who lived in Brooklyn.

The name is numerous in Brooklyn, but Smythe finally found a John Schmitt, the brother of Rosa Helfrich, who believed that he was a cousin of the Buchingers, and from him heard of his sister and of his two cousins, (John) George Schmitt and Henry Schmitt, and was referred by him for further information to (John) George Schmitt.

While hunting for these persons, as he swears, he found that a cousin, supposed to be their first cousin, named Reinfeld, had died some ten or more years previously, insane, in or near Brooklyn, and had left some money in a savings bank, and Smythe found that the defendants above named knew of this money and had made faint efforts to get it, but without success.

He swears that he told the defendants at the start that their cousins in New York, the two Buchingers, were dead, without children, leaving property, and that they (the Schmitts) were probably entitled to it, or to some share in it, but he did not state to them what the property was, and did not mention the house and lot here in question.

He further stated to them, as he swears, that it would be necessary to trace their kinship by evidence from Germany, whence they all came, and would be attended with a great deal of labor and expense, and proposed to undertake to procure it on shares.

On July 8th, 1902, with the aid of information obtained from Frankenhauser and from (John) George Schmitt, principally the latter, he made up a "family tree," showing that the four persons named were the sole heirs and next of kin of the Schmitt blood of Adolph Burnett. This "tree" was offered in evidence and marked *Exhibit C 3* for complainant. It showed seven brothers and sisters in the Schmitt family, of which Adolph Buchinger's mother, Caroline Buchinger, was one, all the offspring of a second marriage of her father, Martin Schmitt.

It is alleged that it was afterwards developed, by further examination in Germany, that the father of (John) George and Henry was brother of the whole blood of Caroline Buch-

inger, but that the father of John Schmitt and Rosa Helfrich was the half-brother only of Caroline Buchinger.

Hence it is alleged by complainant that the two defendants last named, under the doctrine of *Stretch* v. *Stretch, 4 N. J. Law (1 South.) 182,* cannot inherit. I do not find it necessary to determine this question at this time.

Mr. Smythe negotiated with (John) George Schmitt as representing the others, and it was agreed between them that Smythe should undertake the job upon shares.

On the afternoon of the 9th of July, 1902, the day after the last interview with (John) George, Smythe employed a Mr. Campbell, a notary public, employed as a clerk in the United States district attorney's office in the post-office in New York City, to go with him to Brooklyn to take the acknowledgments of the different parties to the powers of attorney. He took in his pocket a blank power of attorney, a rough, unfinished "family tree," written in pencil on a yellow sheet of manila paper, made up from Mr. Frankenhauser's information and what he had gained from time to time (which is marked as *Exhibit C 9* for complainant), and a more shapely one, previously mentioned, made up on July 8th (marked *Exhibit C 8* for complainant).

The two visited Brooklyn and called, first, at the house of (John) George Schmitt, and found that he was absent from home. They went next to the house of his cousin John, whom they found, and induced him to go with them to the house of Henry Schmitt, brother of (John) George, and induced him to go with them and John to a beer saloon near by, where there was a light and a pen and ink, and there the two cousins, John and Henry, signed the power of attorney.

It is quite plain, from the evidence of these persons, that they had been prepared by (John) George for this visit.

Both Mr. Campbell and Mr. Smythe swear that the blanks in the power of attorney were filled up there by Mr. Smythe, in the presence of the parties, before signature. Those blanks are the names of the parties who were to sign, the name of Adolph Buchinger, the decedent, and the name of William M. Hoes, public administrator of the city of New York, his successor, &c.

The defendants, or some of them, swear that those names were not inserted at the time the paper was signed, and as I understand the evidence they state that the name of Charles Hall Adams, which is clearly typewritten in with large capitals, was not there.

If this question is at all important, and there is the least reason to doubt the accuracy of the memory of Mr. Smythe and Mr. Campbell, quite conclusive proof is at hand. In the pencil memorandum of the "family tree" marked *Exhibit C 9* for complainant, before mentioned, the name of Mrs. Helfrich is written "Hilprict." It was also so written in the ink-written "tree" marked *Exhibit C 3* for complainant, which Mr. Smythe had before him. In inserting the names of the persons to execute the paper he wrote the name of Mrs. Helfrich H-i-l-f-r-i-c-t, and when afterwards, on the same evening, he came to procure her signature, he discovered his mistake and erased the word "Hilprict" and wrote over it the word "Helfrich," which alteration is noted by the witness and notary. He also changed the name in the "family tree," *Exhibit C 3*.

Now, it is manifest that if those names had been written in after the execution of the paper by Mrs. Helfrich the mistake would not have been made.

The evidence of Mr. Smythe and Mr. Campbell is that the instrument was read over by Mr. Campbell to the two cousins, John and Henry, and its force and meaning explained by Mr. Smythe as it was being read, and that they executed it intelligently.

An argument was attempted to be made from the character of the ink in the signatures of Henry and John. A part of those signatures seems to be much fainter in tint than the writing in the body of the instrument. The argument was made that they could not have been made with the same pen and ink with which the writing was made in the body of the instrument. I think it entirely immaterial whether Mr. Smythe is accurate in his recollection that the instrument was filled up that evening in the beer saloon or whether it had been already filled out, since I am satisfied it was filled up before or at the

time it was executed, and is, in effect, substantially the instrument which the parties supposed they were signing.

Mr. Smythe suggests that the signers, by accident, dipped their pens in some beer lying on the table. I think this is a probable solution.

The ink of Henry's signature is quite different from that of John, and the ink in "John" and "Schmitt" does not seem to be the same.

The signatures of the last two named being obtained, the parties proceeded at once to the house of Mr. and Mrs. Helfrich and procured her signature. Before she signed her husband read and examined the paper to his satisfaction.

It was not executed by him, nor was it executed by her separate and apart from him, hence, it is contended by the defendants, it can have no force and effect as to real estate.

I am unable to accede to that contention. The contract was made distinctly with regard to Mrs. Helfrich's separate estate and directly for the benefit of that estate, namely, to establish her title thereto. It therefore came directly within the principle upon which the cases of *Wilson* v. *Brown, 13 N. J. Eq. (2 Beas.) 277; Harrison* v. *Stewart, 18 N. J. Eq. (3 C. E. Gr.) 451*, and *Armstrong* v. *Ross, 20 N. J. Eq. (5 C. E. Gr.) 109*, were decided. See, also, *Perkins* v. *Elliott, 23 N. J. Eq. (8 C. E. Gr.) 526.* In these and other cases in this state in the same line, this court has established liens on the separate estate of married women based on a defective instrument.

The theory upon which it is done is this: The instrument defectively executed or acknowledged is absolutely impotent of itself to create any lien, but it has the effect, taken in connection with its consideration, to invest the beneficiary named therein, be he grantee, mortgagee or what not, with an equity, to come into a court of equity and ask that court to create a lien in his favor.

The lien is created by this court and not by the instrument.

Two days later, July 11th, (John) George Schmitt came to the United States district attorney's office, in New York, and executed a power of attorney made out for him alone, but in almost precisely the same verbiage as that executed by the

others, and quite so in tenor and effect. This, also, was executed before Mr. Campbell as a witness and notary.

Each of these instruments occupies the whole of one and a part of another sheet of paper. (John) George's evidence as to the execution of his is remarkable. He admits the signature, but swears that it was made on a single sheet of paper, at his house in Brooklyn; that Mr. Smythe and Mr. Campbell attended there; that he read the paper carefully from beginning to end; and that he had taken special notice of that part which treats of the collecting of rents of lands, and he asked Mr. Smythe what that meant, and that he (Smythe) answered "that it was only a matter of form."

This proves conclusively that (John) George Schmitt knew that the power of attorney dealt with lands as well as personal property. This witness denies, however, that Smythe told him about the death of his cousin until after the papers were signed. He swears that Smythe confined the conversation entirely to the Reinfeld money, in a Brooklyn savings bank.

Now, the first one of the Schmitts that Smythe saw was John Schmitt, the brother of Mrs. Helfrich, and he swears distinctly that at the very start Mr. Smythe told him that his two cousins, the Buchingers, in New York, were dead, and that there was money coming to him, and that he referred Mr. Smythe to (John) George Schmitt as knowing all about the thing. Then Henry Schmitt, a brother of (John) George, swears that when the party came to see him to procure his signature, with the others, to the instrument, he was informed that his two cousins, the Buchingers, in New York, were dead, and that there was money coming to them. Taking (John) George's evidence altogether, I can place no confidence in it where it conflicts with that of the other witnesses.

The principal strength of the defendants' argument was based on the fact that Smythe did not inform them, at or before the execution of the paper, of the extent of the personal property left by Adolph, and did not inform them at all of the existence of the real estate here in question.

Counsel for defendants takes the ground that the rule applying to dealings between principal and agent, attorney and client

and trustee and *cestui que trust,* applies. But I think it does not apply.

These persons were undoubtedly ignorant and very illiterate —(John) George Schmitt was the most intelligent—and the court should be careful to see that no advantage was taken of them, that no false representation was made to them, no information that was asked refused to them and that no hard bargain was procured from them.

In all these matters the complainant stands absolved. He was guilty of no active concealment. The moment the contracts were produced at the hearing and read, and their contents understood, counsel for defendants admitted that they were fair contracts. In fact, they provide simply for repayment of necessary expenses and reasonable compensations for services rendered, and not to exceed one-half the value of the property recovered, and the defendants came under no responsibility whatever. It was also admitted that complainant had rendered valuable services under them and had expended large sums of money.

Let us now look at the relations of the parties at the time these contracts were entered into. The defendants had not heard of the death of their cousins, the Buchingers, and I am not sure, from the evidence, that they had heard that they had assumed the name of Burnett.

The complainant's agent (Smythe) had, at his own risk, taken up the matter of finding the next of kin and heirs of Adolph, Buchinger. He had by memoranda before taken traced the kinship through Caroline Buchinger to her nephews and nieces, the Schmitts, of Brooklyn. The complainant had already opened correspondence with his European connections to trace out the genealogies there and get trace of the Buchingers, as well as the Schmitts. For, it must be remembered, that there might be found living a brother of Gotfried Buchinger, the father of Gotlieb and Adolph, who would take the whole against the Schmitts, or that there might be found nephews and nieces of Gotfried Buchinger, who would come in and divide the inheritance with the Schmitts. All this, bye the bye, was explained to the Schmitts by Smythe.

12

Now, this information obtained by Smythe was his and complainant's own property, and he was under no obligations, either legal or equitable, to transmit it to any person. He had the right to make the best contract for himself that he could, within reasonable bounds and without fraud, for its sale, and for the sale of his future services in establishing the title of the persons entitled thereto. In my opinion, in dealing with those persons, he so dealt entirely at arms'-length. At the moment of dealing with those persons for the use by them of such information and for his services, the relation of attorney and client, principal and agent or trustee and *cestui que trust,* or either of them, did not exist.

It did not come into being until after the contracts were executed. As well might you say that a lawyer could not bargain in advance for the amount of his compensation, or an agent for the amount of his salary, as that the complainant should not bargain in advance for his compensation, without disclosing the extent of the property which he expected to recover.

The defendants insist upon the idea that they were bargaining upon the basis, in their own mind, of the amount, less than $1,000, of the Reinfeld money, and that they were willing to give one-half of that. But surely they ought not to complain if a great deal more than that was to be recovered, so long as they are not called upon and cannot be compelled to pay more than the actual disbursements and what the services are reasonably worth. Besides, I am satisfied that the idea now advanced that the only fund which the parties had in mind was the Reinfeld money is an afterthought, for the simple reason that they could not and did not suppose that their right to the Reinfeld money, if any they had, came through their kinship to the Buchingers. Reinfeld was of the Schmitt blood and the Buchingers were entitled to his money, if at all, precisely in the same way that the defendants were so entitled. The fact that the contract was preliminary to the creation of the confidential relation differentiates the present case from those relied upon by counsel, namely, *Condit* v. *Blackwell, 22 N. J. Eq. (7 C. E. Gr.) 481; Porter* v. *Woodruff, 36 N. J. Eq. (9 Stew.) 174,* and *Lynde* v. *Lynde, 64 N. J. Eq. (19 Dick.) 736.*

In *Lynde* v. *Lynde* the contract was for a fixed percentage, which the court refused to approve, on the distinct ground, however, that the subject-matter (alimony) was beyond the reach of such a contract; but, nevertheless, the court allowed the solicitor and counsel reasonable compensation.

In this case I find there was no relation of trust and confidence between the parties at the time the contract was entered into, and I find, further, that whatever of confidence can be imagined to have existed was not abused, and the contract obtained was a reasonable and fair one.

But the case does not stop here. The complainant and his co-worker (Smythe) immediately set about performing the duties undertaken by them by the instruments in question. Complainant continued his correspondence and spent several hundred dollars in procuring official information of the genealogies of the Schmitt and Buchinger family from the official records in Germany. All of which is admitted to be valuable.

Mr. Smythe employed Mr. Lloyd, of the New York bar, and, after him, Mr. Halpine, to bring Mr. Dawson to account.

In doing this copies of the powers of attorney were filed in the public administrator's office. Letters of administration were taken out by the public administrator upon the estate of Adolph Buchinger, and Dawson was called upon to account by Mr. Lloyd.

Dawson learned, undoubtedly from the public administrator's office, the names of the defendants, and applied to them for an interview in the hope of settling with them, behind the back of complainant and his counsel.

(John) George Schmitt and his cousin John Schmitt crossed to New York on a Sunday morning to meet an appointment with Dawson, and called on Smythe and took him with them to see Dawson.

At this interview that gentleman's character was fully developed. He claimed that he had loaned Götlieb Buchinger, *alias* William Burnett, the $7,200 which he had paid for the property here in question and had his note for it. Mr. Smythe cross-examined him with great skill, and immediately took most efficient means, not necessary here to be repeated, to destroy

absolutely all foundation for such a claim. This was on July 27th, 1902.

He also took prompt, efficient and successful measures to satisfy the tenants of the premises—the rent roll amounted to over $60 per month—that they ought not to pay the rent to Dawson, as they had been doing, but ought to pay the same to an agent of the defendants, and for that purpose appointed Mr. Knox, the defendant herein, who has since that time collected the rents.

This proceeding was of the utmost importance to the defendants, for it placed them in the legal possession of the premises. Its importance appears from a consideration of the circumstances of the great difficulty which the case discloses of making proof in a court of justice that the defendants are the heirs-at-law, either in whole or in part, of Adolph Buchinger. As I understand the evidence, it is highly probable that the making of strict proof would require resort to the official records in Germany, and perhaps of taking depositions thereon.

At any rate, their title, like all titles by descent, rests *in pais* —that is, rests on the existence of facts which from their very nature cannot become matters of record.

And this answers one of the complaints of the defendants, namely, that the complainant has not established the title of the defendants to the land in question in such manner that they can deal with it.

To which complainant answers: I have put you in possession, as heirs-at-law, and you have the same title that any other heir-at-law could have, namely, one that, being in possession, you must defend as best you can; the strength of your title rests on the fact that nobody else can find a better one.

Further, the defendants either have title or they have not. If they have title, they cannot complain that the complainant asks the lien upon it which they have given him; if they have not title, they cannot complain of the complainant for seeking to get a lien on that which they have not. Their position, in this respect, is palpably inconsistent with reason and justice.

Now, going back to July 27th, 1902. At the interview with Dawson other facts were developed, namely, that Dawson was

about to receive $1,500 as the proceeds of a suit against the subway contractor who had caused Gotlieb's death; and, further, they obtained information, as I interpret the evidence, of the precise amount of actual cash realized by Dawson from the savings bank books.

The claim against Dawson was prosecuted with vigor. He abandoned his claim for $7,200, but set up another for more than enough absolutely to swamp the estate; was defeated in that, and was finally made to disgorge. Now, all the information that complainant or Smythe ever had as to the *quantum* of the estate was disclosed on that 27th day of July to (John) George and John Schmitt, and, presumably, through them to their brothers and sisters.

With that information they permitted the complainant and his agent (Smythe) to proceed with their work of establishing the defendants' title and rescuing the estate from Dawson and putting the defendants in possession of the land here involved, and never disputed the validity of their powers of attorney until the next January.

Now, the conduct of the defendants in acquiescing in the further proceedings by complainant and his agent to work and spend money for them, in my judgment, estops them from setting up the non-disclosure of the estate at the execution of the contracts.

It seems to me that this is too plain for argument. They cannot approbate and reprobate. They cannot take to themselves the benefits of complainant's labors and expenditures in their behalf and at the same time repudiate the perfectly fair contracts under which those expenditures were made and that labor performed.

I shall here recite, briefly, the language of the powers which fixes the compensation.

The instrument appoints Charles Hall Adams, of Boston, attorney irrevocable, &c., to collect and receive all moneys, legacies, bequests, inheritance, distributive share of the constituents which the constituents might become entitled to as next of kin of Adolph Buchinger. It then provides for receipts and releases to the public administrator of New York and for a

consent of the settlement of the estate. It then provides for taking possession by the attorney of all landed property which they may become entitled to as heirs-at-law of Adolph, and gives extensive and comprehensive power of dealing with that land, of selling, renting, dealing and compromising actions, &c. Then follows this language:

"The power is coupled with an assignment and interest, to wit, such an interest and assignment of the property, estate, claim, demand, legacy, bequest or *inheritance* to which we are or may become entitled as such heirs or next of kin as will be sufficient to secure him, the said constituent, for his reasonable fees for any services rendered or to be rendered by him, or his substitute, as well as for any necessary disbursements he has made or may hereafter make for or on our account, but not to exceed fifty per cent. of our distributive share of said decedent's estate as such heirs or next of kin."

This language is criticised by counsel for the defendants in that it is limited to fifty per cent. of "our distributive share" of said decedent's estate as such heir or next of kin. It is argued that the words "distributive share" extend only to personal property, and that complainant cannot resort to land as a measure of the value of his services. But I am unable to adopt that view. It is not consonant either with the whole scope of the instrument or with the immediate context. It must be construed in connection with the word "heirs," which refers naturally to lands, and the word "heirs" and "distributive share of land" is intelligible only on that view.

For these reasons I am of the opinion that the complainant is entitled to succeed in this suit; that the conveyance to Drennan must be set aside, and that complainant must be decreed to be entitled to a lien on the interest of the defendants (John) George, Henry and John Schmitt and Mrs. Helfrich for what the court may hereafter determine to be a proper amount under all the circumstances of the case.

For this purpose there must be a reference to a master, and it will probably be necessary to take into account the amount received from the administrator in New York, and possibly to apportion the services and expenses between the sum recovered in New York and the property here in question.

I shall hear counsel as to the details of the order of reference.

On the hearing of the motion for a receiver, counsel for defendants set up a receipt by Mr. Halpine in full for his services in that matter, and it was commented upon in the arguments of counsel on both sides in this cause. I can take no judicial notice of it at present and I can see no effect that it can have except possibly before the master.

The complainant is entitled to a receiver.